IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| GERALD THOMPSON and CYNTHIA JOHNSON,<br><br>Plaintiffs,<br><br>vs.<br><br>WYNDHAM RESORT DEVELOPMENT CORPORATION and WORLDMARK, a Nonprofit Mutual Benefit Corporation,<br><br>Defendants. | 4:21-CV-3305<br><br>MEMORANDUM AND ORDER |

The plaintiffs, Gerald (Jerry) Thompson and Cynthia (Cindy) Thompson (née Johnson), allegedly entered into a contract, and later an addendum to that contract, with the defendants, Wyndham Resort Development Corporation (WRDC) and WorldMark, with the understanding the defendants would provide travel-related benefits and privileges. Filing 11 at 1-2; *see* filing 18-4 at 1-6; filing 18-5 at 1-7. The Thompsons allege, however, that many of the representations made by the defendants about the travel benefits were false, and as a result, they were denied access to the very travel accommodations which had induced them to enter the agreements. Filing 11 at 5-7. Consequently, the Thompsons brought suit, claiming breach of contract, fraud, and violations of the Nebraska Time Share Act. Filing 11 at 7-8. WRDC and WorldMark have moved to dismiss, arguing the Court lacks personal jurisdiction. Filing 16. For the following reasons, the Court agrees and will grant the defendants' motion.

BACKGROUND

Jerry is an 80-year-old veterinarian residing in North Platte, Nebraska. Filing 21 at 2. Cindy is his 75-year-old wife. Filing 21 at 2. In December 2017, Jerry and Cindy travelled to Las Vegas, Nevada to attend the National Finals Rodeo. Filing 21 at 2. In the lobby of their hotel, Cindy approached a booth hoping to purchase tickets to a jousting event. Filing 21 at 3. A woman offered Cindy tickets to the event and a free dinner if she and her husband agreed to listen to a presentation. Filing 21 at 3. The Thompsons agreed and were taken to another Las Vegas motel. Filing 21 at 3.

Once they arrived, the defendants' employees allegedly subjected the Thompsons to high-pressure sales techniques. Filing 21 at 1, 3. For example, after the main slideshow presentation ended, the Thompsons thought they were free to leave; instead, they were allegedly asked to speak with an older gentleman who had already purchased a membership and a "lady in a uniform." Filing 21 at 4. According to the Thompsons, they were unable to refuse because the bus that had transported them to the presentation was not leaving and they did not know how to get back to their hotel. Filing 21 at 4.

During this conversation, "Jerry understood them to say that Jerry and Cindy could stay at Wyndham motels in locations throughout the United States for no other payment or a big discount and that they could go on trips including an Alaska cruise." Filing 21 at 4. The Thompsons also claim that the employees assured them their children and grandchildren could use the travel benefits to stay at qualifying hotels in Nebraska, filing 21 at 4, as could Jerry when attending veterinary conferences around the state. Filing 21 at 5. Overall, they were promised "it was easy to use the Wyndham benefits under

2

the contract." Filing 21 at 6. This meeting allegedly went on for almost three hours. Filing 21 at 5.

Ultimately, the Thompsons decided to sign a membership agreement and made a payment. Filing 21 at 6; *see* filing 18-4 at 1-6. Jerry was unsure of how the payment was made, but later learned he had signed a credit card application form and another form opening a PayPal account. Filing 21 at 6. And from January 12, 2018 to March 2, 2018, the Thompsons allegedly paid the defendants over $45,000 pursuant to the membership agreement. *See* filing 11 at 3-4; filing 21 at 6. Eventually, the Lincoln County Court in Nebraska entered a default judgment against Jerry for money owed on the credit card account that he was allegedly unaware of opening. Filing 21 at 6.

In March 2018, the Thompsons returned to Las Vegas and "stayed at a Wyndham hotel for 2 days thinking they could use [their] points or discounting . . . at that hotel." Filing 21 at 7. They allege that while at the hotel, they were again approached by someone trying to sell them travel and lodging benefits. Filing 21 at 7. Since they already had a membership, the woman allegedly offered to help them understand their contract and get more benefits. Filing 21 at 7. The Thompsons claim to have agreed only because she "was quite insistent" and "made them feel like they couldn't walk away." Filing 21 at 7.

At the meeting, which again lasted approximately three hours, the woman explained to the Thompsons that they could upgrade their membership. Filing 21 at 7. According to the Thompsons, they agreed to do so because the woman made it sound like "what they already signed wasn't that great of a deal" and "it wouldn't help them with the travel and lodging that they wanted to do in Nebraska." Filing 21 at 7. As a result, the Thompsons

3

signed another agreement and paid another $25,000. Filing 21 at 7; *see* filing 18-5 at 1-5. In addition to upgrading their membership agreement with the defendants, the Thompsons also executed a membership agreement with a separate travel benefits program called "WorldMark by Wyndham My Savings." *See* filing 18-5 at 6-7.

The Thompsons were allegedly charged over $1,200 for their March stay at the Wyndham hotel in Las Vegas despite their initial membership agreement, the subsequent upgrade, and reassurances during the booking process that their membership benefits would be applied to the costs of the hotel. Filing 21 at 8. According to the Thompsons, they were also unable to arrange an Alaskan cruise for the summer of 2018, as had been assured by the defendants, because of barriers put in place by the defendants. Filing 21 at 8. After having issues claiming their benefits, the Thompsons made many calls to WRDC from their home in North Platte, but none of their calls were returned. Filing 21 at 8. And the Thompsons claim that they haven't stayed at any Wyndham motels in Nebraska because "Wyndham motels don't seem to acknowledge that Jerry and Cindy have any rights under the agreements that they signed." Filing 21 at 9.

As a result, the Thompsons filed suit against WRDC in the District Court of Lincoln County, Nebraska, alleging breach of contract, fraud, and violations of the Nebraska Time Share Act. *See* filing 1-2. After WRDC successfully removed the action to this Court, *see* filing 1, the Thompsons amended their complaint, adding WorldMark as a party. *See* filing 11. The amended complaint alleges that the travel benefits purchased by the Thompsons were provided

4

jointly by WRDC and WorldMark.[1] *See* filing 11 at 7-9. The defendants have now moved to dismiss the complaint under Fed. R. Civ. P. 12(b)(2), arguing the Court lacks personal jurisdiction. Filing 16.

## STANDARD OF REVIEW

When jurisdiction is challenged on a pretrial motion to dismiss, the nonmoving party need only make a prima facie showing of jurisdiction. *Pangaea, Inc. v. Flying Burrito LLC*, 647 F.3d 741, 745 (8th Cir. 2011); *see Fastpath, Inc. v. Arbela Techs. Corp.*, 760 F.3d 816, 820 (8th Cir. 2014). The evidence is viewed in the light most favorable to the plaintiff. *Viasystems, Inc. v. EBM-Papst St. Georgen GmbH & Co.*, 646 F.3d 589, 592 (8th Cir. 2011). Nonetheless, if the defendant controverts or denies jurisdiction, the plaintiff still carries the burden of proof. *See Fastpath*, 760 F.3d at 820; *Dairy Farmers of Am., Inc. v. Bassett & Walker Int'l, Inc.*, 702 F.3d 472, 475 (8th Cir. 2012); *Viasystems*, 646 F.3d at 592. The plaintiff's prima facie showing must be tested, not by the pleadings alone, but by the affidavits and exhibits presented with the motions and opposition thereto. *Fastpath*, 760 F.3d at 820; *Dairy Farmers*, 702 F.3d at 475.

---

[1] The parties dispute whether WorldMark was actually a party to any of the membership agreements executed by WRDC and the Thompsons. Filing 18-3 at 2. However, at this stage, the Court will take the Thompsons' allegation as true and assume, without deciding, that WorldMark was a party to the contracts. But this assumption does not change the outcome of the Court's decision since, even when viewing the evidence in the light most favorable to the plaintiff, the Court concludes it cannot exercise personal jurisdiction over WorldMark.

5

DISCUSSION

The defendants have moved to dismiss the Thompsons' complaint, arguing the Court lacks personal jurisdiction. Filing 16. In order to satisfy the Due Process Clause and justify personal jurisdiction, a defendant must have minimum contacts with the forum state such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.[2] *Pangaea*, 647 F.3d at 745; *see also Dairy Farmers*, 702 F.3d at 477. The fundamental inquiry is whether the defendant has purposefully availed itself of the benefits and protections of the forum state to such a degree that it should reasonably anticipate being haled into court there. *Viasystems*, 646 F.3d at 594; *see also Dairy Farmers*, 702 F.3d at 477. Purposeful availment is required to ensure that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or the unilateral activity of another party or a third person. *Stanton v. St. Jude Med., Inc.*, 340 F.3d 690, 693-94 (8th Cir. 2003).

Jurisdiction is proper, however, where the contacts proximately result from actions by the defendant itself that create a substantial connection with the forum state. *Id.* at 694. The minimum contacts necessary for due process may be the basis for either "general" or "specific" jurisdiction. *Dairy Farmers*, 702 F.3d at 475; *Johnson v. Arden*, 614 F.3d 785, 794 (8th Cir. 2010).

---

[2] Nebraska's long-arm statute extends to the fullest extent permitted by the Due Process Clause, so the inquiry into personal jurisdiction collapses into the due process analysis. *See Fastpath*, 760 F.3d at 820; *RFD-TV, LLC v. WildOpenWest Finance, LLC*, 849 N.W.2d 107, 114 (Neb. 2014).

GENERAL JURISDICTION

First, the defendants argue the Court lacks general personal jurisdiction over them because they are not "at home in the forum State," and "having a registered agent to accept service of process in Nebraska and/or possessing a certificate of authority from the Secretary of State authorizing the company to transact business" in the state is not enough "to allow the Court to exercise general jurisdiction over a foreign company." Filing 17 at 5-7. The Court agrees.

A court obtains general jurisdiction against a defendant who has "affiliations with the State . . . so continuous and systematic as to render [it] essentially at home in the forum State," even if the injuries at issue in the lawsuit did not arise out of the defendant's activities directed at the forum. *Creative Calling Sols., Inc. v. LF Beauty Ltd.*, 799 F.3d 975, 979 (8th Cir. 2015) (citing *Daimler AG v. Bauman*, 571 U.S. 117, 122 (2014)). The paradigmatic all-purpose forums for general jurisdiction are a corporation's place of incorporation and principal place of business. *Daimler*, 571 U.S. at 137.

But WRDC is a Oregon corporation with its principal place of business in Florida. Filing 18-1 at 2. And WorldMark is a California non-profit mutual benefit corporation with its principal place of business also in Florida. Filing 18-2 at 1. Instead, the Thompsons argue that WRDC, as a foreign corporation, impliedly consented to general jurisdiction in Nebraska by filing a certificate of authority to transact business in the state and subsequently designating a registered agent to receive process in the state.[3] Filing 21 at 13-14. "A defendant may voluntarily consent . . . to the [personal] jurisdiction of a court

---

[3] The Thompsons do not make this argument as to WorldMark. *See* filing 21 at 13-14.

which otherwise would not have jurisdiction over it." *Knowlton v. Allied Van Lines, Inc.*, 900 F.2d 1196, 1199 (8th Cir. 1990). And "[o]ne of the most solidly established ways of giving such consent is to designate an agent for service of process within the State." *Id.*

However, states have the power to limit the effect of such designations, as whether appointing a registered agent to receive service or filing a certificate of authority to transact business in a state constitutes implied consent to personal jurisdiction in that state is a question of state law. *See Sondergard v. Miles, Inc.*, 985 F.2d 1389, 1396 (8th Cir. 1993); *Knowlton*, 900 F.2d at 1199. Thus, when a federal court is sitting in diversity, it must look to the applicable state law on this issue to determine whether the defendant has impliedly consented to general jurisdiction in the courts of the forum state, and therefore, is also subject to the federal court's personal jurisdiction under Fed. R. Civ. P. 4(k)(1)(A). *See Knowlton*, 900 F.2d at 1196; *see also Wallace v. Mathias*, 864 F. Supp. 2d 826 (D. Neb. 2012).

Here, the Nebraska Supreme Court has held that treating a company's registration to do business in the state and appointment of an agent for service of process "as implied consent to personal jurisdiction would exceed the due process limits." *Lanham v. BNSF Ry. Co.*, 939 N.W.2d 363, 367-71 (Neb. 2020) (citing *Daimler*, 571 U.S. 117; *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915 (2011)). The court made it clear that under Nebraska law such actions are *insufficient* to find a business has impliedly consented to the exercise of personal jurisdiction. *Id.*

Still, the Thompsons argue that *Lanham* is not binding on this Court, and instead, ask the Court to follow the Eighth Circuit's holding in *Knowlton*, which held that a defendant corporation impliedly consents to personal

8

jurisdiction in Minnesota by registering to transact business and appointing an agent to accept service according to Minnesota law. *See* filing 21 at 14. However, the state law applicable to the personal jurisdiction analysis in *Knowlton* was Minnesota law, and at that time, the Minnesota Supreme Court had interpreted its state law to say that "appointment of an agent for service of process . . . gives consent to jurisdiction of Minnesota courts for any cause of action." *Knowlton,* 900 F.2d at 1200. But the Nebraska Supreme Court clearly rejected this interpretation of its state law in *Lanham*.

And, as stated above, this Court applies Nebraska state law when determining whether, under Nebraska statutes, the defendants are deemed to have consented to personal jurisdiction by registering to transact business and appointing an agent to receive service. Since neither defendant is "at home" in the forum state based on its incorporation or principal place of business, and WRDC's actions of registering to transact business in Nebraska and appointing a registered agent to receive service are insufficient to impliedly consent to general jurisdiction under Nebraska law, the Court concludes it cannot exercise general personal jurisdiction over either defendant.

The Thompsons' other arguments regarding general jurisdiction are equally unpersuasive. First, the Thompsons allege that the defendants maintain contractual relationships with 100-200 Wyndham-franchised motels in Nebraska at which the Thompsons could have used their travel benefits, thereby subjecting the defendants to general jurisdiction. *See* filing 21 at 15. In rejecting this argument, it should first be noted that the United States Supreme Court has held that, when a corporation's place of incorporation and principal place of business are *not* in the forum state, only in an "exceptional case" will the corporate defendant's operations in the state "be *so substantial*

9

and of such a nature as to render the corporation at home in that State." *BNSF Ry. Co. v. Tyrrell*, 137 S. Ct. 1549, 1558 (2017) (emphasis added). In *Tyrrell*, having "2,000 miles of railroad track and more than 2,000 employees in Montana" was not substantial enough to render BNSF at home in the state when considering the corporation's activities in their entirety. *Id.*

Here, the Thompsons have failed to meet their burden of showing this is an "exceptional case" based on the defendants *substantial* operations in Nebraska. According to the defendants, "[h]otels or motels bearing the 'Wyndham' name are owned by Wyndham Hotels & Resorts, Inc. . . . [which is] located in Parsippany, New Jersey, has a different corporate board and corporate officers than Defendants . . . . [and] is not a subsidiary or parent to Defendants." Filing 25 at 10. Taking it a step further, a WRDC corporate officer provided an affidavit to the Court stating that WRDC "does not own or lease *any* real estate in Nebraska, including any resort properties, hotels, or motels in Nebraska" nor does it "franchise, operate, or manage *any* resort properties, or hotels or motels, in Nebraska, including any 'Wyndham' branded hotels or motels." Filing 18-1 at 1-2 (emphasis added). A corporate officer for WorldMark submitted the same. Filing 18-2 at 2.

And the Thompsons have not produced any evidence to refute the defendants' claims. Simply put, according to the evidence in the record, any timeshare properties owned and operated by the defendants appear to be completely separate entities from the Wyndham hotels located in Nebraska. *See* filing 25 at 8. At most, the Thompsons have claimed the defendants maintain business contracts with certain Wyndham hotels in Nebraska, but under *Tyrrell*, it is clear that such business operations would not be "so substantial" as to subject the defendants to general jurisdiction in Nebraska.

10

Next, the Thompsons argue that the defendants are subject to general jurisdiction in Nebraska because they *may* have used a "discount aggregator" as their "agent" to enter into contracts with Nebraska retailers, and in turn, provided travel discounts at these retailers to the Thompsons through the "WorldMark by Wyndham My Savings" program. *See* filing 21 at 17-20. Again, however, these claims—which are not supported by any evidence in the record—fall short of establishing the defendants are "at home" in Nebraska.

Specifically, affidavits provided by the defendants explain that the "WorldMark by Wyndham My Savings" program "allows the party enrolling in the program to take advantage of discounts offered by a variety of brands unrelated to Wyndham, including third-party restaurants, retail stores, movie theaters, airlines, hotels and motels, and attractions related to vacation destinations at over 300,000 locations." Filing 18-6 at 2. According to the defendants, neither WRDC nor WorldMark "have contracts with the retailers or brands offering the discounts"; instead, "a third-party company known as a 'discount aggregator' offers the program's benefits directly to enrollees" and "maintains the contractual relationship with the retailers offering discounts, not WRDC or WorldMark." Filing 18-6 at 2. And the Thompsons' membership agreement made it clear that WRDC "accepts no responsibility for the acts or omissions of any persons providing such programs or benefits directly to members." Filing 18-6 at 3.

As such, the evidence in the record refutes the Thompsons' bare-bones claim that the defendants *may* have used a discount aggregator to enter into contracts with Nebraska retailers to offer travel discounts to members of the WorldMark by Wyndham My Savings program. For the sake of completeness, however, even if the Court were to take as true the Thompsons' claim that the

11

"discount aggregator" *may* have been acting as the defendants' agent when contracting with Nebraska retailers,⁴ *see* filing 21 at 19, the outcome would be the same. If that were the case, the defendants, through the discount aggregator, would have entered into contracts with *over 300,000 travel-related destinations across the country*, including some which may have been in Nebraska. And as noted by the Supreme Court in *Tyrrell*, "[a] corporation that operates in many places can scarcely be deemed at home in all of them." 137 S. Ct. at 1559. Such activities in Nebraska simply would not be "so substantial," when viewing the defendants' actions in their entirety, to find the defendants "at home" in Nebraska. Accordingly, if this Court is to exercise jurisdiction over the defendants, it must be specific jurisdiction.

### SPECIFIC JURISDICTION

The defendants also argue the Court lacks specific jurisdiction, as they do not have sufficient contacts with the state of Nebraska. Filing 25 at 9-14.

---

⁴ The Thompsons have not explicitly alleged in their complaint that this "discount aggregator" was acting as the defendants' "agent" when it contracted with retailers across the nation. *See* filing 11. At most, they state in their brief to the Court that discovery "may show" the aggregator is an agent of the defendants. Filing 21 at 19. But affidavits provided by the defendants show the opposite—that the defendants were in no way responsible for the acts or omissions of the aggregator. And although the Thompsons need only make a prima facie showing of jurisdiction, it is not enough for the Thompsons to claim the defendants *may have* been acting through a third-party to offer discounts with Nebraska retailers that the Thompsons *may* have used in the future. At this stage, the Thompsons' claims of jurisdiction are to be tested, and there is simply no evidence in the record that would allow the Court to reasonably infer the defendants are subject to general *or* specific jurisdiction because of the actions of the "discount aggregator."

12

Specific jurisdiction over a defendant is exercised when a state asserts personal jurisdiction over a nonresident defendant that has purposefully availed itself of the privilege of conducting business in the forum in a suit arising out of or related to the defendant's contacts with the forum. *See Pangaea*, 647 F.3d at 745-46; *Johnson*, 614 F.3d at 794-95. It is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws. *Dairy Farmers*, 702 F.3d at 477.

When jurisdiction is premised on the existence of a contract, the Court is to evaluate prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing to determine whether the defendant purposefully established minimum contacts within the forum. *Id.* at 475 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 479 (1985)). And the Eighth Circuit has set forth a five-part test for measuring a defendant's contacts with a forum state: (1) the nature and quality of the contacts with the forum state, (2) the quantity of those contacts, (3) the relationship of the cause of action to the contacts, (4) the interest of the forum state in providing a forum for its residents, and (5) the convenience of the parties. *Id.* at 477; *Wells Dairy, Inc. v. Food Movers Int'l, Inc.*, 607 F.3d 515, 518 (8th Cir. 2010). The first three factors are primary factors, and the remaining two are secondary. *Johnson*, 614 F.3d at 794. A court is to look at all the factors in the aggregate and examine the totality of the circumstances in determining personal jurisdiction. *Id.*; *see Dairy Farmers*, 702 F.3d at 477.

However, entering into a contract with a forum resident, standing alone, does not provide the requisite contacts between a nonresident defendant and the forum state *because it is the contacts between the defendant and the forum*

13

*state—not a forum resident—that are of interest.* See *Mountaire Feeds, Inc. v. Agro Impex, S.A.*, 677 F.2d 651, 655 (8th Cir. 1982); *see also Institutional Food Mktg. Assocs., Ltd. v. Golden State Strawberries, Inc.*, 747 F.2d 448, 456 (8th Cir. 1984); *Aaron Ferer & Sons Co. v. Atlas Scrap Iron & Metal Co.*, 558 F.2d 450, 455 n.6 (8th Cir. 1977). It is also well-established that the use of arteries of interstate mail, telephone, railway and banking facilities is insufficient, standing alone, to satisfy due process. *Wells Dairy*, 607 F.3d at 519. Indeed, isolated connections that are random, fortuitous, and attenuated contacts cannot justify the exercise of personal jurisdiction. *Viasystems*, 646 F.3d at 594.

In the instant case, the defendants emphasize the following undisputed facts: (1) the contracts at issue were negotiated and executed in Nevada, (2) any representations made by the defendants regarding the contracts occurred in Nevada, and (3) the Thompsons were provided with a Nevada Public Offering Statement. *See* filing 18-3 at 1-2; filing 21 at 2-8. Additionally, although the Thompsons may have had intended to use some of their travel benefits in Nebraska—and allegedly communicated this to the defendants— they also understood the benefits as allowing them to stay at "resorts *throughout the world*." Filing 11 at 2. Thus, the defendants' only direct contacts during the negotiation and execution of the contracts were with Nebraska residents, not with the state of Nebraska. And as stated above, a contractual relationship with a Nebraska resident is not enough, standing alone, to justify the Court's exercise of specific jurisdiction over the defendants.

The defendants further argue they have not made meaningful contacts with Nebraska because neither entity: (1) has offices in Nebraska where they conduct timeshare sales or other business, (2) has bank accounts located in Nebraska, (3) conducts direct marketing or sales efforts in Nebraska to sell

14

timeshare plans or units, (4) owns or leases any real estate in Nebraska, or (5) franchises, operates, or manages any resort properties, or hotels or motels, in Nebraska. Filing 18-1 at 1-2; filing 18-2 at 1-2. And the Court agrees these facts only further demonstrate that the nature, quality, and quantity of the defendants contacts with Nebraska, particularly as related to the causes of action at issue, are clearly insufficient to justify specific jurisdiction.

Still, the Thompsons argue the defendants made meaningful contacts with Nebraska when they targeted rodeo fans from agricultural states, including Nebraska, to attend their high-pressure sales presentations and again when they fraudulently represented that the travel benefits could be used in Nebraska. Filing 21 at 21. However, that the defendants allegedly knew certain injuries arising under a contract may be felt in Nebraska since the Thompsons are Nebraska residents is insufficient to confer specific jurisdiction.[5] *See Viasystems*, 646 F.3d at 594-95. Instead, under the "effects test":

> a defendant's extraterritorial tortious acts can serve as a source of personal jurisdiction only where the plaintiff makes a prima facie showing that the defendant's acts (1) were intentional, (2) were

---

[5] If that were true, the Court could exercise personal jurisdiction over a defendant in every case where the defendant willfully entered into a contract with a plaintiff who resides in the forum state, since there would always be a possibility that injuries to the plaintiff under the contract would, in part, be felt in by the plaintiff in the forum state. And as the Court has already stated, the law is clear that entering into a contract with a forum resident, standing alone, does not provide the requisite contacts between a nonresident defendant and the forum state.

15

> uniquely or expressly aimed at the forum state, and (3) caused harm, the brunt of which was suffered-and which the defendant knew was likely to be suffered-[in the forum state].

*Johnson*, 614 F.3d at 796 (alteration in original).

And the Eighth Circuit has construed this test "narrowly," such that it applies only where the defendant's allegedly tortious acts "are performed for the *very purpose* of having their consequences felt in the forum state. *Id.* at 796-97 (emphasis added). Therefore, even though purposely directing fraudulent communications at a resident of Nebraska as part of an ongoing business relationship may, in part, be a basis for specific jurisdiction, *see Oriental Trading Co., Inc., v. Firetti*, 236 F.3d 938 (8th Cir. 2001), that the plaintiff merely feels the effect of such statements in the forum state is insufficient to confer personal jurisdiction absent additional contacts, *see Johnson*, 614 F.3d at 797.

Here, although the defendants may have known the Thompsons lived in Nebraska and had plans to travel within the state (among other places), there is no evidence that their activities were expressly or uniquely aimed at Nebraska, or were performed for the very purpose of having their consequences felt in Nebraska. The defendants were conducting sales presentations and executing contracts in Nevada. And as stated by the Thompsons, they were allegedly promoting their travel contracts to residents of *various* agricultural states, not just Nebraskans. In addition, the representations allegedly made by the defendants promised travel opportunities not just to Nebraska, but also to Alaska and other exclusive locations "throughout the world."

16

As such, the Court cannot reasonably infer that the defendants allegedly tortious conduct in Nevada was done for the very purpose of having the consequences felt in Nebraska. And aside from the fact that the defendants allegedly directed fraudulent communications at Nebraska residents (while they were in Nevada), the Thompsons have not provided evidence of any other contacts the defendants had with the state of Nebraska. That the effects of the defendants' acts may have been felt in Nebraska, without more, is simply not enough to confer specific jurisdiction under the effects test.[6]

Finally, the Thompsons emphasize how they allegedly made payments to the defendants from Nebraska. Filing 21 at 21. However, according to the Thompsons, they also made multiple, significant payments to the defendants in Nevada. *See* filing 21 at 6-7. And the Thompsons using Nebraska banks to make payments to foreign corporations does not explain *the defendants'* contacts with the forum state, which is the critical issue when determining personal jurisdiction. Additionally, the Court is unpersuaded by the Thompsons' reliance on *Quality Pork International v. Rupari Food Services., Inc.*, 675 N.W.2d 642, 649 (Neb. 2004). *See* filing 21 at 22-25. Specifically, the Court rejects the argument that *Quality Pork* stands for the proposition that any money transaction occurring in Nebraska as part of a contract subjects all

---

[6] The Court will note that "effects test" is merely "an additional factor to consider when evaluating a defendant's relevant contacts with the forum state" under the Eighth Circuit's five-part test. *Johnson*, 614 F.3d 785, 796-97. Thus, even if some effects were felt by the Thompsons in Nebraska, this must be considered in light of the totality of the defendants' contacts in Nebraska. And as further outlined below, the defendants' contacts with Nebraska in this case are insufficient to satisfy due process.

17

parties to the contract to specific jurisdiction in the state. *See* filing 21 at 24-25.

In *Quality Pork* the Nebraska Supreme Court found the defendant was subject to specific jurisdiction in Nebraska after agreeing to pay for pork orders placed with a Nebraska company and sending two payments to the pork company in Nebraska. 675 N.W.2d at 651-52. And the Thompsons argue that it "is not significant" that in their case the payments were instead made by *the Thompsons* and sent *out of Nebraska*. Filing 21 at 24-25. But in reaching its decision, the court in *Quality Pork* noted that, "[w]hether a forum state court has personal jurisdiction over a nonresident defendant depends on whether . . . *the defendant himself* has acted in a manner which creates substantial connections with the forum state." *Quality Pork*, 675 N.W.2d at 651 (emphasis added). Here, that is not the case, as it was not the defendants who made or promised to make payments into Nebraska. The reality is, when focusing on *the defendants' contacts* with Nebraska as related to these claims—as the Court must—it simply cannot be said that the defendants purposefully availed themselves of the privilege of conducting business in Nebraska.

And although Nebraska undoubtedly has an interest in providing a forum for its allegedly injured citizens, that interest "cannot make up for the absence of minimum contacts." *Fastpath*, 760 F.3d at 824. Further, since both parties will be inconvenienced if the proceedings occur outside of their respective states, this factor does not weigh in favor of either party. *See Dairy Farmers*, 702 F.3d at 479. Therefore, the Thompsons have failed to carry their burden of establishing that the Court can exercise personal jurisdiction over the defendants. While the Thompsons may very well have a viable claim

18

against the defendants, this Court simply does not have jurisdiction to hear those claims. Accordingly, the defendants' motion to dismiss will be granted.

IT IS ORDERED:

1. WRDC and WorldMark's motion to dismiss for lack of personal jurisdiction (filing 16) is granted.

2. The Thompsons' complaint is dismissed.

3. A separate judgment will be entered.

Dated this 23rd day of March, 2022.

BY THE COURT:

John M. Gerrard
United States District Judge

19